Arline L. COOPERSMITH, Appellant,

v.

Richard L. ROUDEBUSH, Individually
and as Administrator, Veterans
Administration.

No. 74–1776.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 7, 1975.

Decided Aug. 18, 1975.

John Silard, Washington, D. C., with whom Joseph L. Rauh, Jr., Washington, D. C., was on the brief for appellant.

Betty E. Uhrmacher, Asst. U. S. Atty., for appellee. Earl J. Silbert, U. S. Atty., John A. Terry, Robert M. Werdig, Jr., Asst. U. S. Attys., and David T. Stitt, Asst. U. S. Atty., at the time the brief was filed, were on the brief for appellee.

Marilyn M. Fisher, Washington, D. C., filed a brief on behalf of Women's Legal Defense Fund, Inc., as amicus curiae urging reversal.

Before MacKINNON and ROBB, *Circuit Judges,* and CHRISTENSEN,* *Senior District Judge* for the District of Utah.

Opinion for the court filed by *Circuit Judge* MacKINNON.

MacKINNON, Circuit Judge:

Appellant, an unsuccessful applicant for employment as an Attorney-Advisor with the Board of Veterans Appeals (BVA) in the Veterans Administration (VA), filed a formal complaint alleging discrimination on the basis of sex. After exhausting her administrative remedies, she brought the instant suit in District Court under 42 U.S.C. § 2000e–16(c). The court granted a summary judgment in favor of the VA, ruling that denial of employment to appellant "was not based on sexual discrimination." (App. 346–52). We affirm.

## I.

Appellant Coopersmith, a fifty-two-year-old woman, received a law degree from New York University in 1943. Following her graduation, she clerked for a law firm for approximately eight months. She was admitted to the New York Bar in June, 1944, and immediately enlisted in the Women's Army Corps where she served for two years. Some of this service was with the Judge Advocate General's office. Following her discharge she entered the private practice of law and in 1946 began clerking for a judge of the New York City Magistrate's Court. Appellant was married in 1947 and left work in 1948 to have her first child. In 1949 she moved with her husband to New Orleans, Louisiana, where she received a second law degree from Tulane University in 1950 and was admitted to the Louisiana Bar. She engaged in part-time private practice until the birth of her second child in 1951.

In 1952 appellant moved with her husband to New Jersey where she did not seek legal employment but taught school on a part-time basis. In 1961 she obtained part-time employment in a non-attorney capacity with the American Friends Service Committee. She returned to full-time employment as a New Jersey probation officer in 1963, when her youngest child was twelve years old. In 1964 she moved with her family to the District of Columbia and subsequently obtained a non-attorney position with the United Planning Organization. In 1968 she commenced her present employment with the D.C. Department of Corrections where she has served in various

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

non-legal positions generally described as involving social work duties.[1]

On April 21, 1973, appellant applied for a position as an Attorney-Advisor with the BVA.[2] She was subsequently interviewed on May 8 by Franklin D. Burchfield, the Executive Assistant to the Chairman, and Sidney J. Shuman, the Vice-Chairman of the BVA. During the interview, appellant was given a test problem which had been routinely given to applicants for Attorney-Advisor positions since approximately 1968 (App. 279–80). The test problem, called the "Umbers case," is based on an actual BVA case history. Facts and applicable statutes and regulations are given in the problem, and the applicant is asked to write an opinion rendering a decision and setting forth supporting reasoning. Appellant submitted her test opinion on May 10.[3]

Appellant's test response was routinely submitted to Vice-Chairman Shuman and Chief Members Kleinfeld and Callison. Shuman, who had been chiefly responsible for hiring attorneys for more than 10 years (App. 263), underlined certain passages, wrote the words "not so" on one particular passage (App. 270), and transmitted the entire paperwork to Kleinfeld without further comment. Kleinfeld, who was unaware that appellant had already been interviewed, read the materials and transmitted them to Callison with the following written comment:

> This veteran has all of the educational and work background requirements to warrant an interview. She is a mature lady, but hasn't been a "lawyer" for years. This shows up in her evaluation of the case sample. I still think she should be interviewed to determine what kind of person we are dealing with.

App. 175. After examining the materials, Callison attached the following comment and returned them to Shuman:

> We are looking for lawyers, not social service workers. This lady had never had any significant legal writing experience, and is employed now in the field in which her expertise lies. I seriously question whether she is prepared to put in the work day required of the job. I have no objection to an interview. Her sample opinion is not impressive.

App. 228. Shuman decided to turn down appellant's application in light of these evaluations, and she was in due course notified of the rejection by a letter from Burchfield, dated June 5 (App. 30).[4] Burchfield later testified that appellant was rejected (1) because she had no recent legal experience of any sort relevant to the type of work done by the BVA (App. 111); and (2) because "her writing skills were deficient," as evidenced by her poorly reasoned and "very mediocre" test response (App. 112, 116).[5]

On June 7, 1973, appellant's husband informed an Equal Employment Opportunity (EEO) Counselor of her dissatisfaction with the refusal of employment. When an attempt to resolve the matter informally was unsuccessful, she filed a formal complaint charging sex discrimination on June 13. After an in-

---

1. There is no indication why appellant has not taken steps to obtain admission to the local Bar during her period of residence here.

2. Appellant had previously applied for employment with the BVA in 1970 and had been rejected. She did not contest this earlier non-selection.

3. The text of the test problem and appellant's response thereto were made part of the record as Exhibit No. 33 to the EEO Complaints Examiner's Report.

4. While appellant's application was pending before the BVA, she and/or her husband attempted to bring various political pressures to bear on the agency in order to secure a more favorable consideration of the application. (App. 25–26, 70–71, 74–75, 137–38, 245).

5. Burchfield also noted that Donald Santorelli, then head of the Law Enforcement Assistance Administration, had called the BVA on appellant's behalf. When informed by Shuman of the nature of the position for which appellant had applied, he stated he could not recommend her for such a position (App. 74, 105, 272).

vestigation of her complaint, an EEO Officer informed her by letter that the BVA's proposed disposition would not be in her favor. Appellant thereupon requested a hearing which was held on October 30 and 31 before an EEO Complaints Examiner. The Examiner subsequently recommended a finding of "no discrimination because of sex" (App. 338–45).[6] On January 14, 1974, the General Counsel of the VA issued a decision in which he adopted the findings and recommendation of the Examiner and ruled that "discrimination based on sex (female) is not substantiated by the evidence" (App. 336–37). Appellant's subsequent suit under 42 U.S.C. § 2000e–16(c) resulted in a summary judgment in favor of the VA, accompanied by a specific finding that appellant was not discriminated against on the basis of her sex (App. 346–52). This appeal followed.

## II

Appellant argues that the BVA's preference that applicants for the position of Attorney-Advisor be recent law school graduates or have had recent experience in the practice of law discriminates against women because they are more likely to temporarily abandon their employment to raise children, and therefore she asserts that the rejection of her application on that basis was unlawful. She also argues that if the rejection was based on her poor performance on the test problem, the test is itself sex-discriminatory in effect and its use is also unlawful.

■ The basis for appellant's arguments is *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), where the Court held that even in the absence of any discriminatory intent by an employer, federal equal opportunity law forbids the use of job qualifications or tests which have a disproportionate impact upon certain protected groups of job applicants, unless the employer can demonstrate that those requirements are job-related—*i. e.*, justified by the needs of the business and shown to be valid measures of future job performance. Specifically, *Griggs* held unlawful a private employer's[7] use of a high school diploma qualification and certain I.Q. testing requirements which had been

---

**6.** With respect to appellant's qualifications, the Examiner found:

> Addressing only that information conveyed in her Personal Qualifications Statement (IR Ex. 16), the Examiner finds that the complainant was qualified to serve in the position for which she had applied. She does meet and exceed the minimum qualifications requirements (IR Ex. 31) for employment as Attorney-Advisor. The Examiner also finds that her SF–171 is devoid of any indication of unremote service in a legal or quasi-legal capacity, or any indication of duties performed in a field akin to the writing of appellate briefs. Further, the Examiner notes that the complainant has not engaged in any formal study of law for in excess of 20 years. It thus is apparent that a review of the complainant's application, similar to the review completed by Mr. Shuman, reveals no recent experience in areas allied to the work for which she had applied.
>
> A survey of applications put forward by those 25 individuals who successfully competed with the complainant for available vacancies on the Board of Veterans Appeals staff discloses that 20 had graduated from law school in 1972 or 1973. Of the remaining five, two were practicing attorneys and three were employed in the examination or adjudication of claims in other Veterans Administration offices.
>
> The Examiner therefore finds that the recency of education and creditable experience of the 25 selectees renders the complainant relatively less qualified than those against whom she competed.

App. 343–44. Concerning the test problem, the Examiner stated:

> There is no evidence that the agency's use of a test case to screen applicants would affect female applicants without recent related experience in a manner disproportionate to that with which it would affect male applicants without recent related experience.
>
> The complainant's challenge of the agency's employment of a sample decision as a discriminatory tool is not found to be supported by the information of record.

App. 344.

**7.** Although *Griggs* dealt with the practices of a private employer, in light of the 1972 amendments to Title VII of the Civil Rights Act, extending the provisions of that Act to government employees, *see* 42 U.S.C. § 2000e–16, job qualifications for federal positions must also be measured under the *Griggs* standard.

shown to have an adverse impact upon black job applicants.[8]

Evaluation of a job qualification under the *Griggs* test involves a two step analysis. First, one complaining of unintentional discrimination due to employment qualifications must show that the challenged standard operates to disqualify members of a protected group of job applicants to which the complainant belongs at a "substantially higher rate" than other groups of applicants. 401 U.S. at 426, 91 S.Ct. 849. It is clear that this initial burden to show a discriminatory effect is on the party challenging the job qualification.[9] In the instant case, this meant that appellant had the burden of showing that the preference for applicants who have had recent legal experience has a disproportionate impact on women applicants. Once this showing is made, the employer has the burden of establishing that the employment practice in question is related to job performance.[10]

■ The instant record does not contain evidence from which it could be inferred that either the BVA's preference that applicants for the position of Attorney-Advisor have had recent legal experience or the test problem operate to disqualify women at a substantially higher rate than men. See Findings of Fact ¶¶ 15, 23, Conclusions of Law ¶ 7; App. 348, 349, 351. The only statistics presented to this court by appellant relate to the proportion of women in the general labor force who interrupt their employment at some time to engage in child-rearing. However, there is no indication that this general statistic holds true in the case of women attorneys. Nor is there any showing that a significantly smaller percentage of male attorneys than female attorneys temporarily abandon their practices for whatever reason. Appellant's suggestion that this court take "judicial notice" of certain alleged "facts" relating to the employment behavior of women is simply not sufficient to remedy the deficiencies in her evidence.

In contrast, the record does contain the following evidence as found by the Complaints Examiner:

> Mitigating against a finding of discrimination is the evidence that two of the 25 successful applicants with whom the complainant competed are women (II.E. # 1) and the evidence that eight of the 100 Attorney-Advisors currently employed by the Board of Veterans Appeals, or 8%, are female. Hearing Exhibit Number 5 reflects that 1.8% of all Veterans Administration attorneys are female. Hearing Exhibit Number 3, introduced

---

8. Since the instant case involves individualized criteria in contrast to the standardized requirements struck down in *Griggs*, there appears to be some basis for distinguishing that decision. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

   > *Griggs* differs from the instant case in important respects. It dealt with standardized testing devices which, however neutral on their face, operated to exclude many blacks who were capable of performing effectively in the desired positions. *Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives. . . . Respondent, however, appears in different clothing. *Id.* at 806, 93 S.Ct. at 1826.

9. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1826, 36 L.Ed.2d

668 (1973); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 221 (5th Cir. 1974); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Comm'n, 482 F.2d 1333, 1335 (2d Cir. 1973); Woods v. North American Rockwell Corp., 480 F.2d 644, 646–47 (10th Cir. 1973); Bellamy v. Mason's Stores, Inc., 368 F.Supp. 1025, 1026 n.1 (E.D. Va. 1973).

10. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

   On the record before us, neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. 401 U.S. at 431, 91 S.Ct. at 853.

by the complainant's representative, establishes that 4.13% of all lawyers employed in professional and related services throughout the United States in 1970 were female. Hearing Exhibit Number 4, also introduced by complainant's representative, reveals that females represent (1) 4.96% of lawyers employed throughout all industries in the United States in 1970; (2) 9.87% of all lawyers in public administration throughout the United States in 1970; and (3) 10.27% of all lawyers in welfare, engineering, architectural, accounting and related services throughout the United States in 1970. . . . The Board of Veterans Appeals thus compares favorably in its representation of female attorneys.

App. 345. In light of this evidence suggesting that the BVA job requirements have not had the effect of discriminating against women, and in the absence of any contrary evidence presented by appellant, the District Court was clearly correct in determining that appellant had failed to sustain her burden under *Griggs* of proving that the disqualifying standard has a disproportionate impact on a protected class of applicants. The threshold issue not having been met, appellant could not maintain this action.

█ Even if one assumes for purposes of argument that the preference for recent legal experience has a disproportionate impact on female applicants, appellant has failed to show that the refusal to employ her was a result of that discrimination. By her own testimony, she completed her child-rearing duties and resumed full-time employment some ten years prior to filing her application with the BVA. Thus her inability to satisfy the BVA's prerequisites for employment was attributable to her failure to resume the practice of law during this period and had no relationship to her family duties which had long since ceased. Assuming there are women applicants whose lack of recent legal experience is solely due to child-rearing activities and who therefore would have standing to complain that the BVA's job requirements discriminate against them on the basis of their sex,[11] appellant simply does not fall within that category.

█ Furthermore, were we required to reach the issue, it appears that the BVA's preference for attorneys with recent legal experience is a valid job-related requirement. It is certainly understandable that the BVA would not wish to hire inexperienced applicants as Attorney-Advisors. Nor can it be said that prior legal writing experience is not related to the applicant's anticipated performance of the duties of an Attorney-Advisor. It would seem reasonable to believe that an applicant who has recently engaged in the practice of law or who is a recent law school graduate possesses sharpened legal writing skills and therefore that the BVA job standard is a reasonable predictor of success in the Attorney-Advisor position which primarily requires such skills. However, as the BVA will have the burden of proof on this issue, the job-relatedness of the recent legal experience requirement must be left to a case in which its validity has been properly challenged.

An additional grounds for rejecting appellant's application was her poor performance on the test problem. She attempts to characterize the low quality of her sample answer as simply an alternate expression of her lack of recent legal experience and thus argues that the test is not an independent basis for the BVA decision. However, the test relates to general legal writing ability, which includes analytical ability, and appel-

11. If the BVA assertion that it only requires *recent* legal experience is correct, it apparently would not refuse to employ an applicant who had a temporary lapse in practice attributable to pregnancy. Because the more extended period taken by appellant for child-rearing is a voluntary undertaking, we have some doubt that a job requirement which penalized such behavior would be found to violate the Civil Rights Act. However, as appellant's lack of qualifications is not due to her child-rearing duties, we have no occasion to decide that question in the instant case.

lant's lack of that ability might be attributable to a number of factors other than her lack of recent experience. In any event, this court could hardly require that the BVA employ appellant on the chance that she might be able to develop the necessary legal writing skills during the training period. Such skills are not so easily acquired.

■ Assuming that the test was a factor in her rejection, appellant argues that it has not been "validated" as required by *Griggs* and therefore may not be used in the employment decision. Initially it must again be observed that appellant has failed to introduce evidence demonstrating that the test has a discriminatory effect. As the District Court found, appellant "has failed to advance any proof whatsoever the challenged test herein operates to disqualify women at a substantially higher rate than men." Findings of Fact ¶ 25, App. 349. Her attack on the test is simply based on the same assertions which she claimed showed that the recent legal experience preference was discriminatory in effect. We have already seen that her showing on that question was deficient, and her attack on the test must fail for the same reason.

Even had the necessary preliminary showing been made, this test presents an example of "content" validity. See *Douglas v. Hampton,* 168 U.S.App.D.C. —, 512 F.2d 976 (1975);

> "Content" validity is established when the test closely approximates the tasks to be performed on the job by the applicant.

*Id.* at —, 512 F.2d at 984. A sample opinion based on an actual BVA case, representative of the type of work performed by Attorney-Advisors, and evaluated by the same individuals for whom appellant would have prepared opinions had she been hired, quite clearly has content validity. Thus we find no defect in the test which would preclude the BVA from using it to evaluate applicants.

The Complaints Examiner compared appellant's test answer to those submitted by 21 of the 25 applicants who successfully competed against appellant (the responses of the other four not being located) and concluded:

> Close and particular attention has been paid to the elements of interpretation of legal provision, consideration of all material evidence, soundness of reasoning, the proceeding toward sound conclusion in orderly fashion and clarity of thought and expression as they are displayed in the sample decision of Mrs. Coopersmith and those of the 21 of her 25 successful competitors, as are available.

> The Examiner finds the agency's appraisal of the complainant's sample decision, and the agency's view of the quality of her written opinion relative to the quality of those decisions submitted by her successful competitors, to be reasonable and tenable and free from discrimination.

App. 345. Nothing has been presented which in any way challenges the validity of the Examiner's conclusion.

An examination of the record leads one to the inescapable conclusion that appellant's application was rejected for the one clearly lawful reason—she was not the most qualified applicant for the job. The order of the District Court dismissing appellant's complaint, with prejudice, is accordingly affirmed.

*Affirmed.*