**Floyd Leroy REEVES, Individually and as a member of the class of persons similarly situated, Plaintiff,**

v.

**Reginald EAVES, Individually and in his capacity as Commissioner of Public Safety, et al., Defendants,**

**Frank Roberts and the Fraternal Order of Police, Intervenors.**

**AFRO–AMERICAN PATROLMEN'S LEAGUE et al., Plaintiffs,**

v.

**Reginald EAVES, Individually and in his capacity as Commissioner of Public Safety, et al., Defendants,**

**John Zimmer et al., Intervenors.**

Civ. A. Nos. 18191, 18227.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 11, 1976.

David W. Crosland, Atlanta, Ga., for plaintiff Floyd Reeves.

Benjamin W. Spaulding, Spaulding, Montgomery & Associates, Atlanta, Ga., for plaintiffs Afro-American Patrolmen's League and others.

Henry L. Bowden, John E. Dougherty, Atlanta, Ga., for Reginald Eaves and other defendants.

Garland, Nuckolls & Kadish, Atlanta, Ga., for Frank Roberts and Fraternal Order of Police.

William A. McHugh, Jr., Adair, Goldthwaite, Stanford & Daniel, Atlanta, Ga., for Zimmer, Umphress, Lane, Sanders and Fulton County Police Benevolent Ass'n.

MOYE, District Judge.

## PRELIMINARY INJUNCTION

### FINDINGS

The within application for preliminary injunction and continuance of a temporary restraining order issued by this Court on the 24th day of February, 1976, having come on to be heard before the Court on March 4, 1976, and arguments and evidence having been presented to the Court on behalf of all named parties to the litigation including intervenors, the Court makes the following findings:

The evidence presented by the City shows, among other things, that during 1975 the Bureau of Police Services hired

31 sworn personnel and 113 civilian personnel broken down by race as follows:

| Sworn | Civilian |
|---|---|
| 19 black males | 45 black males |
| 2 white males | 12 white males |
| 8 black females | 42 black females |
| 2 white females | 14 white females |

Of the sworn personnel hired in 1975, 87% were black; 13% white. Of the civilian personnel hired in 1975, 76% were black, 24% white. Of total personnel hired, 80% were black; 20% white.

As of the end of 1975, there was a total of 1449 sworn personnel in the Atlanta Police Department, of whom 433 or 30% were black; 1016 or 70% were white. The disparity was solely in the male category since there were 72 white females and 72 black females employed.

The Court cannot tell whether the above figures include the overwhelmingly black Classes 81 and 82. If not, the percentage of black employees will increase slightly.

According to a letter dated February 20, 1976, to the Court by counsel for the City, Class No. 81, sworn in on December 1, 1975, consisted of:

- 9 black females
- 15 black males
- 2 white males
- 2 white females

Class No. 82, sworn in on January 19, 1976, despite this Court's previous order forbidding racial discrimination in hiring, consisted of:

- 13 black females
- 7 black males
- 2 white females

During the hearing, the suggestion was made by counsel for the Afro-American Patrolmen's League that the Court ought to make some sort of comparison between the actions of the present black administration (black Police Commissioner acting under a black Mayor), which took office either in late 1973 or early 1974, with those under the previous administration (white Chief of Police under a white Mayor). Such comparison, while of doubtful relevance to consideration of a preliminary injunction, rather than final relief, however, may illustrate the appropriate functions of this Court and of the police bureau and City administration in preventing unconstitutional discrimination, and also emphasize the unique posture of this litigation.

While there is not a complete record of the activities of the prior administration before this Court, the Court has examined certain exhibits introduced by the Department of Justice during the taking of the deposition of former Chief of Police Inman which apparently shows that the racial composition of the Atlanta Police Department as of January 7, 1974, was:

| | | |
|---|---|---|
| white | 1149 | 79% |
| black | 306 | 21% |
| | 1455 | |

The racial composition of new employees hired between April 25, 1973, and January 7, 1974, was:

| White | | | Black | | |
|---|---|---|---|---|---|
| Males | 210 | 58% | Males | 78 | 22% |
| Females | 38 | 11% | Females | 33 | 9% |
| Total | 248 | | Total | 111 | |

Thus, during the period involved, which immediately preceded the present City administration, the Police Department new hires were 69% white—31% black, which, in view of statistics hereinabove set forth, necessarily means that new black hires were a greater proportion of all new hires than blacks were a component of the total force by approximately 10%. During that same period, according to the same exhibits, of 1411 applicants screened, 834 or 59% were white—577 or 41% were black.

At least part of the situation set forth above may be explained by a letter to Chief John Inman from the Department of Justice, dated June 19, 1973, from Mr. Herbert C. Rice, Director of the Department of Justice, Office of Civil Rights Compliance, wherein it was stated that "it is noted that although more black

**534**

applicants were recruited in the past three years, they fail the selection process at a much greater rate than white applicants. In 1970, 6.5% of black male applicants were found eligible for appointment as against 27.2 of white males. In 1971, the figures were 9.14 for black males as against 35.92% for white males."

The Department then concluded that these figures indicated the need for recruiting more black males if representation on the force was to be increased substantially. Other suggestions were made, such as greater utilization of females, validation (not elimination) of employment tests, greater utilization of blacks in training positions, etc.

■ At the time the letter from the Department of Justice was written, in mid-1973, it was stated that there were only 16 policewomen, of whom 13 (about 82%) were white, and 3 (about 18%) black. As noted above, the December 31, 1975, figure for policewomen, as the Court interprets that term, is 72 (50%) black—and 72 (50%) white. Considering the fact, as noted above, that during 1975 8 (80%) black females were hired and 2 (20%) white females were hired, it seems clear that in this category at least, further preferential hiring clearly would be discriminatory.

As to training personnel, the Court notes that, while it does not have comparable data for mid-1973, the Department at present has 37 personnel in its training department as follows:

| | | |
|---|---|---|
| Black males | 18 | 49% |
| Black females | 11 | 28% |
| White males | 7 | 19% |
| White females | 1 | 4% |

Blacks thus constitute 77% of the important training department. Since black women now constitute 50% of the total sworn contingent, the discrepancy between black female training personnel (28%) and white female training personnel (4%) may indicate a need for some explanation.

■ In any event, as the Court explained at the hearing, it is not the function or intention of this Court at this time and in this Order to resolve definitely what if any affirmative action, including possibly preferential hiring and/or promotion, may be required in the Atlanta Police Department. It is clear that plaintiffs and the class they represent (blacks) thought that there was discrimination present requiring correction by this Court when they brought this suit; it is equally obvious that intervenors and the class they represent (whites) think that, as a result of the 1973–1974 change in the City administration, the shoe is on the other foot. The final balance, or corrective measures must await the final decree in this case, and it is the hope of this Court that, now that all parties have felt the pinch of the shoe of discrimination, a 100% non-discriminatory personnel policy for the Police Bureau may be arrived at following careful consultation with counsel for all interested parties to the extent possible, and litigation, as thorough as necessary, to the extent required. The purpose of this preliminary injunction is simply to prohibit any and all discrimination pending that final decree.

The obviously preferential hiring exhibited by Classes 81 and 82 necessitates a factual inquiry as to how they were selected. As the Court is informed, the selection process is virtually 100% subjective—part interview, part performance evaluation.

There presently is no entrance or promotion test. Although the Department of Justice suggested only that the Otis-Lennon test be validated, it appears in fact to have been completely dropped by the present administration. The Department has also dropped completely height requirements and a physical agility test as allegedly showing a discriminatory effect—a finding that seems at least superficially questionable. Furthermore such requirements would appear, again at least superficially, to have a direct relevance to jobs involving physical contact with persons who may not want to be taken into custody.

Thus, the Court by this order is enjoining any personnel action based on race until the final determination of this case—and will require reports monthly of all personnel action (hiring or firing) by the Department. The Court will cooperate with the parties and counsel, to develop interim controls or objective tests which will permit the Department to operate in the personnel area on the basis of relevant qualifications, rather than race, and will be prepared to consider and act expeditiously when the parties are in doubt as to whether particular matters are permitted or prohibited by this order and wish the Court to resolve the problem.

■ The Court perhaps should note at this point that, faced in 1973 with a departmental situation in which whites greatly outnumbered blacks, and in a larger proportion than true of the relevant population base, affirmative action, as set forth in the letter from the Department of Justice, seemed called for —i. e.—the encouragement of a larger number of qualified minority applicants to present themselves for employment. But such affirmative action as suggested by the Justice Department did not and should not include unilateral discrimination by the Department itself in favor of less qualified applicants on the basis of race, or the lowering of qualification standards so as to impair the Department's paramount, overriding function of protecting persons and property within the City of Atlanta. Nor is the Court finding this in fact has occurred, but simply wishes the parties to understand that if any such preferential or discriminatory action is necessary to overcome the effects of any prior discrimination, it *must* come by court decree—not by a subjective, individualized selection process where there is no opportunity objectively to ascertain the extent of the discrimination, or its necessity within the requirements of the Constitution of the United States.

■ Pursuant to the request made by the Court at the hearing, counsel for the City has submitted a proposed injunctive decree which would modify in certain respects the temporary restraining order now in effect. The City suggests a provision eliminating unsworn civilian personnel from the decree and, of course, the parties to the case as now constituted are all sworn officers. But, it now appears that the final decree of this Court necessarily will affect entrance requirements. The exhibits submitted by the City (D.3) show transition of a substantial number of civilians to sworn status. Thus, of 21 white males hired (to sworn status) since August 1974, 2 were promoted from prior civilian employment; of 7 white females hired to sworn status during that period, 5 were previously civilian employees. The corresponding figures for blacks were: of 40 black males, 22 came from prior police civilian employment, and 24 of 39 black females came from such employment. Thus civilian status, whether it be office or security employment, or cadet status, or whatever, is a prime recruitment area for sworn personnel. To exempt civilian employees from the Court's bar on discriminatory employment might well present the Court with a fait accompli which it would be most difficult, if not practically impossible, to alter. This fact is of initial importance in view of the evidence, as set forth above, of preferential hiring of civilian employees; of all civilian personnel hired in 1975, 77% were black, and blacks now constitute 60.8% of the Department's civilian personnel. The Court declines the City's suggestion.

The suggestion of the intervenors that the Bureau articulate its policy with respect to pregnant female police officers assigned to outside (street) detail seems unobjectionable, and will be adopted.

In short, it is the opinion of this Court that possibly unlawful discriminatory personnel changes are occurring so rapidly under the present police department administration that to fail to issue this preliminary injunction might well totally frustrate this Court's power to deal with a difficult situation on a constitutional

basis and reserve the field to the unguided, unsupervised, unreviewable, subjective selection process of the present police administration. The Court simply does not believe, under the law and Constitution, that can be tolerated.

## ORDER

WHEREFORE, the Court orders and decrees that, pending final order and decree in this case:

### 1.

It is the order of this Court that the proposed Consent Decree between the original parties to this litigation not be implemented in whole or in part by any of the named defendants pending further order or orders of this Court.

### 2.

It is further ordered that the defendants and particularly Commissioner A. Reginald Eaves and the Atlanta Bureau of Police Services are restrained and enjoined until further order or orders of this Court from

(a) Permanently assigning any vacant positions where race, creed or color is in any way a consideration in the selection of the assignee;

(b) Permanently assigning any member of Police Academy Classes 81 and 82, or permitting the assignment of any such person to become permanent; and

(c) Making any change in the assignment of any police officer or making any change in the composition of the Force of the Atlanta Bureau of Police Services (including civilian employees) which is in any way based upon or influenced by factors of race, creed, color, national origin or sex.

### 3.

All promotions, filling of job vacancies and other personnel action among or affecting personnel in the Atlanta Bureau of Police Services shall be based upon merit, qualifications and length of service and where merit and qualifications of one candidate for a vacancy are not demonstrably superior to those of another, length of service shall govern the selection and assignment.

### 4.

Defendants may continue their emphasis upon the recruiting of black applicants but selection of applicants for hire shall be based upon merit and qualifications without regard to race, creed, color, sex, religion or national origin.

### 5.

The Atlanta Bureau of Police Services is directed to adopt a policy with respect to the job assignment, during pregnancy, of female police officers who become pregnant while assigned to outside (street) detail, which policy shall be uniformly applicable to all such employees and is directed to announce such policy to all employees without delay.

### 6.

The purpose of this order of the Court is to maintain the present status quo within the Atlanta Bureau of Police Services and it is not the Court's intention to prohibit the superiors within the Bureau from carrying out their executive duties and functions. Assignments of present police officers from different duties and different shifts may be made by the superior officers where there is documentation demonstrating the need for such change in assignment or duties and such assignments, and such changes are in no way based on race, creed, color, national origin or sex, unless such is a bona fide occupational qualification for a particular assignment. Provided further that the creating or avoiding a change in the make-up of the units affected in race, creed, color, national origin or sex shall not be a permissible consideration in such transfers.

### 7.

No retaliatory or punitive action of any sort shall be taken by defendants against anyone by reason of his participation in any capacity in this proceeding.

### 8.

The City shall furnish the Court, and counsel for all parties, a report as of the end of each month, within 15 days there-

after, of each and every hiring, firing, promotion, demotion, or suspension, with substantiating documentation and reasons therefor, as well as the status of the matter as of the effective date of the report. The report shall indicate the race and sex of the affected party. This paragraph of the Court's injunction will not apply to minor or routine transfers. However, if any party claims any such exempted action is contrary to the letter or spirit of this order, it may be brought to the Court's attention for appropriate action.

9.

Defendant City shall furnish a copy of this order to each affected employee.