dure violated the "when due" clause of 42 U.S.C. § 503(a)(1), and held:

"We conclude that the word 'due' in § 303(a)(1), when construed in light of the purposes of the Act, means the time when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions; any other construction would fail to meet the objective of early substitute compensation during unemployment. Paying compensation to an unemployed worker promptly after an initial determination of eligibility accomplishes the congressional purposes of avoiding resort to welfare and stabilizing consumer demands; delaying compensation until months have elapsed defeats these purposes. It seems clear therefore that the California procedure, which suspends payments for a median period of seven weeks pending appeal, after an initial determination of eligibility has been made, is not 'reasonably calculated to insure full payment of unemployment compensation when due.'" Id. at 133, 91 S.Ct. at 1355.

Accordingly, the *Java* decision is clearly limited to situations where after a claimant has been initially determined eligible to receive benefits for a particular period, his benefits for that particular period are then terminated. In this case, the initial determinations are made on a week-to-week basis. Therefore, *Java* would be applicable in this case if after a claimant is found eligible for a particular week, his benefits for that particular week were terminated. That situation does not exist here; thus, *Java* is not applicable.

A judgment will be entered in favor of the defendants and against the plaintiffs and the cause will be dismissed with prejudice.

Richard L. **MOSLEY**, Plaintiff,

v.

**UNITED STATES of America et al., Defendants.**

**No. C–74–2445 WWS.**

United States District Court, N. D. California, Civil Division.

Jan. 5, 1977.

Saul M. Weingarten, Seaside, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., George Christopher Stoll, Asst. U. S. Atty., Civ. Div., San Francisco, Cal., for defendants.

## ORDER GRANTING SUMMARY JUDGMENT

SCHWARZER, District Judge.

Plaintiff Richard L. Mosley, a white security guard at the Naval Postgraduate School (NPS) in Monterey, California, complains in this action of racial discrimination in the promotion of Fred A. Davis, a black security guard, to the position of guard supervisor over plaintiff and four other applicants for promotion. After exhausting his administrative remedies in investigative and formal hearing procedures provided by Civil Service Commission regulations, 5 C.F.R. 713.211, *et seq.*, plaintiff brought this action seeking damages and a new selection process for the position. Defendants, which include the United States, the Commanding and Civilian Personnel Officers of NPS, and two of plaintiff's supervisors, have moved to dismiss or in the alternative for summary judgment. Because the Court has determined that the record discloses no evidence sufficient to raise a genuine issue of material fact with respect to racial discrimination in the selection procedure for the position, defendants' motion for summary judgment must be granted.

## FACTS

The Naval Postgraduate School at Monterey employs security personnel to patrol and secure the school building and grounds. At the times relevant to the complaint in this action, Chief Joseph Carpino, a white guard supervisor with a GS–8 employment grade level, headed a force of approximately 20 men including two guard supervisors at the GS–5 level and 11 security guards at the GS–4 level. The force included 4 blacks and one Spanish American at the GS–3 and 4 levels. The remaining guards and all supervisors were white. Plaintiff, a white man, and Fred Davis, a black man, were among the security guards at the GS–4 level. The entire guard force was supervised by Naval Lieutenant Commander Robert Delashmitt, a white man. (Hearing Examiner's Findings, Doc. # 24, Tab 7, p. 97.)

In October 1973, one of the GS–5 guard supervisor positions became vacant on the retirement of a white guard supervisor. On October 25, 1973, the position was advertised under a civil service vacancy announcement. Based on their applications and other data, seven guards were certified as eligible for the position and were rated on their qualifications by civil service personnel. Six of the guards received identical 85.0 ratings, including: Fred A. Davis (Black), Johnny Ferguson (White), Edward L. Herman (White), Edward Smallfoot (White), Eugene Sogge (White) and William Talbert (Black). One white guard, Edward DeLaunay, received a 75.0 rating. Plaintiff did not submit an application for the position. On November 20, 1973, and without any further formal selection procedure, Lieutenant Commander Delashmitt selected Edward Smallfoot, one of the white guards with an 85.0 rating, for the position. Immediately following the selection of Smallfoot, Davis and Talbert initiated informal racial discrimination complaints with a federal Equal Opportunity Counsellor at NPS. Following an investigation, the selection of Smallfoot was rescinded and the position re-opened on December 18, 1973 (Hearing Examiner's Findings, Doc. # 24, Tab 7, pp. 97–98).

On December 20, 1973, a meeting of guards was called by Lieutenant Commander Delashmitt to discuss problems with the position. Although the recollections of the guards and Delashmitt as to what took place at the meeting are somewhat different, all versions seem to agree that Delashmitt asked Fred Davis to leave the meeting and asked the remaining guards about their objections to the promotion of Smallfoot

over Davis. (Hearing Transcript, Doc. # 24, Tab 8, pp. 29, 39, 41, 49–50, 63–64, 73–74, 141–146.) The testimony of the guards at the administrative hearing revealed considerable dissatisfaction with the manner in which Smallfoot's promotion and past security promotions had been handled. (Hearing Transcript, e. g., pp. 37, 39, 52–56, 76–80, 117–125.) However, the record does not show that either the events at the meeting or Lieutenant Commander Delashmitt himself played any role in the second selection process.

Six persons were certified as eligible for the position in the second selection process. These persons were rated by civil service personnel on their qualifications for the position as shown by the Personal Qualifications Statements and two Appraisal for Promotion evaluations submitted for each applicant. The results of the rating are summarized in the following table:

Rated as the Only "Highly Qualified" Applicant Available

| | |
|---|---|
| Fred Davis (black) | 87.5 |

Rated as the "Best Qualified" Applicants Available

| | |
|---|---|
| Edward R. Smallfoot (white) | 82.5 |
| Johnny Ferguson (white) | 80.0 |
| William Talbert (black) | 80.0 |
| Plaintiff Richard Mosely (white) | 77.5 |
| Edward DeLaunay (white) | 75.0 |

(Tabbed Enclosure #3)

---

The record reveals that Marian Kwock, a Supervisory Personnel Staffing Specialist, rated the applicants, but it does not reveal the exact method she used in converting the application data into numerical ratings. Kwock testified at the administrative hearing that she had given plaintiff full credit for his military training and other experience, although there was some question about whether a certain four week military training course was included. (Hearing Transcript, Doc. # 24, Tab 8, pp. 190–193.) A facial examination of the application data of plaintiff and Fred Davis discloses several obvious differences: (1) Davis stated that he had worked as acting guard supervisor on many occasions and reported over six months of experience as guard supervisor; plaintiff reported no similar experience; (2) Davis reported 46 units completed or in progress in a junior college program in police science; plaintiff indicated that he was attending junior college, but provided no evidence of his progress; (3) Davis was rated generally above average and outstanding in job performance categories by his two appraising officials, Chief Carpino and Lyle Hall; plaintiff was rated generally average by Chief Carpino and Luther Woodward. Both Davis and plaintiff had undergone various types of security training in the military and both had military security positions. (Personal Qualification Statements of Richard L. Mosely and Fred A. Davis, Announcement No. 73–168). Facial examination of the application data of the other persons rated above plaintiff reveals generally higher job performance appraisals for those persons.

The ratings and application data were submitted to a five-man board specially appointed to interview the applicants and select one of them to fill the guard supervisor position. The board was appointed by the Director of Military Operations and Logistics at NPS and consisted of the following members: Commander D. A. Beals (chairman and a white man); Theodore H. Calhoon (white man); Chief Carpino (white man); H. A. Titus (white man); and Harold Williams (black man). Of the five board members, only Chief Carpino knew the applicants, the history of the first selection process, and the previous problems in filling

the position. Commander Beals knew that the board had been convened because of some problem with the position, but he did not know the nature of the problem. (Hearing Examiner's Findings, Doc. # 24, Tab 7, p. 98; Hearing Transcript, Doc. # 24, Tab 8, p. 165.)

The only information concerning the board's internal workings is contained in the testimony of Commander Beals at the administrative hearing. Beals testified that board members were briefed by personnel officials on the ratings of the applicants and were given the applications (Hearing Transcript, Doc. # 24, Tab 8, p. 164). The Board allowed twenty minutes for each applicant interview. Applicants were asked questions by board members and each was given the opportunity to make a statement at the close of the interview. (Id. at p. 164.) At the conclusion of the interviews, the board unanimously selected Fred Davis for the position (Id. at 166). Beals testified that Davis had a very good interview and was more confident in the interview than plaintiff. Plaintiff himself admitted that he was nervous at the interview and stammered through a question about why he should be promoted. (Plaintiff's Depo., pp. 15–17). Beals stated that he regarded confidence when meeting people for the first time as an important attribute of a guard supervisor. (Id. at 167, 171). Beals regarded Davis as better qualified than plaintiff, citing in part Davis' education in police science. (Id. at 165, 167–168, 177). Beals reported that Chief Carpino did not make any attempt to influence other board members—Carpino voted last and gave his opinion last in board deliberations. (Id. at 166).

Immediately following the selection, plaintiff initiated a complaint of racial discrimination and pursued his complaint through informal equal opportunity investigative procedures. When he did not obtain relief, plaintiff sought and obtained a full administrative hearing on his complaint. The hearing examiner's exhaustive review of the evidence and recommended finding of no discrimination are part of the record

herein. The examiner, who had the opportunity to review nearly all of the evidence now before the court on these motions, found no serious conflicts or credibility issues to resolve. The examiner summarized the evidence presented at the hearing and stated the following conclusion:

"As pointed out by the EEO Counselor and the EEO Investigator, there had been problems in connection with the promotion policies and procedures utilized within the Administration Department, Security Division. However, there was no evidence to substantiate complainant's contention that he was discriminated against *because of his race* (Caucasian) when Mr. Davis was promoted . . . ." (Emphasis in Examiner's Findings.) (Hearing Examiner's Findings, Doc. # 24, Tab 7, p. 105.)

After the adverse decision of the hearing examiner became the final administrative disposition of his complaint, plaintiff filed this action alleging racial discrimination against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e *et seq.*, the Fifth Amendment to the United States Constitution, and 42 U.S.C. Sec. 1985 (Plaintiff's Complaint, Para. 1). In his deposition and again in an affidavit plaintiff stated that he was not claiming that the persons involved in the second selection process entertained any feeling against him because of his race, but that the *selection procedure* discriminated against him *because of his race.* (Plaintiff's Deposition, Doc. # 17, pp. 22–24; Plaintiff's Affidavit, Doc. # 27, p. 5.) Plaintiff's specific attacks on the selection process will be discussed below in connection with the motion for summary judgment.

## PRELIMINARY ISSUES—THE PROPER DEFENDANT AND THE PROPER LEGAL BASIS FOR RELIEF

■■ Counsel for defendants makes two preliminary arguments attacking the face of the complaint, neither of which is seriously disputed by plaintiff. First, counsel correctly notes that the Supreme Court has

held that Title VII of the Civil Rights Act of 1964 is the exclusive remedy for federal employment discrimination, and therefore seeks dismissal of the other legal bases for relief asserted in the complaint. *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Second, counsel also properly observes that the only proper defendant in this case under 42 U.S.C. Sec. 2000e–16(c) is the Commander of NPS, the head of the unit employing plaintiff, and therefore seeks dismissal of all other defendants. *Hackley v. Roudebush*, 171 U.S.App.D.C. 376, 520 F.2d 108, 115, n. 17 (1975); *Jones v. Brennan*, 401 F.Supp. 622, 627 (N.D.Ga.1975). Ordinarily, the court would enter an order dismissing the surplus claims and defendants, leaving a properly pleaded Title VII claim for further consideration. But since the court has determined, for the reasons stated below, that summary judgment must be granted dismissing the entire complaint, such action is unnecessary.

## SUFFICIENCY OF THE EVIDENCE TO RAISE A GENUINE ISSUE OF MATERIAL FACT RESPECTING RACIAL DISCRIMINATION

Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, requires that "All personnel actions affecting [federal] employees . . . shall be made free from any discrimination based on race, color, religion, sex or national origin." 42 U.S.C. § 2000e–16(a).[1] Although the Supreme Court has not yet articulated the elements of a cause of action under this section,[2] it has done so under 42 U.S.C. § 2000e–2 which prohibits employment discrimination in the private sector "because of [an] individual's race, color, religion, sex, or national origin." The similarity in language and purpose of the two sections is manifest; it is unlikely that Congress intended any distinction in the ability of private and federal employees to establish the facts necessary to eradicate prohibited discrimination.[3] Therefore, the court will examine the decisional law underlying § 2000e–2 to determine what facts plaintiff must prove to establish his cause of action under § 2000e–16.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the seminal case, the Court held that Title VII prohibited a private employer from requiring a high school education or passing of a standardized general intelligence test as a condition of employment when neither requirement was significantly related to job performance and both requirements operated to exclude blacks at substantially higher rates than whites. While the court relied on plaintiff's showing that the requirements operated to exclude more blacks than whites, it emphasized that Congress, through Title VII, had made qualifications the controlling factor in employment decisions because the prohibited factors of race, sex, etc. were irrelevant. The Court summarized the objective of Title VII in the following often-quoted passage:

"Congress did not intend by Title VII, however, to guarantee a job to every

---

**1.** Section 2000e–16 applies by its terms to several classes of federal employees including employees "in military departments as defined in section 102 of Title 5." The Department of the Navy, which operates the Naval Postgraduate School at Monterey where plaintiff is a civilian employee, is a military department listed in 5 U.S.C. § 102.

**2.** The major decisions interpreting § 2000e–16 have involved its procedural provisions and implications. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) (holding that federal employees have the same right to trial de novo in the district court on Title VII claims as private employees); *Brown v. General Services Administration*, 425 U.S. 820, 96

S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding that Title VII is the exclusive remedy for claims of discrimination in federal employment).

**3.** Cf. *Ayon v. Sampson*, 544 F.2d 525 (9th Cir. 1976). House Report No. 92–238 on the proposed enactment of § 2000e–16 contained the following statement:

"Accordingly there can exist no justification for anything but a vigorous effort to accord Federal employees the same rights and impartial treatment which the law seeks to afford employees in the private sector." U.S.Code Cong. & Adm.News, pp. 2137, 2158 (1972).

person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." 401 U.S. at 430–431, 91 S.Ct. at 853.

While *Griggs* provided a concise and powerful statement of the purpose of Title VII, its approach sheds little, if any, light on the practical problems of defining the Title VII cause of action and allocating burdens of proof in a Title VII action. The Court undertook this task in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff Green, a black man, sought re-employment with McDonnell as a mechanic after a lay-off, but was rejected on the ground that he had participated in a "stall-in" at McDonnell's plant during which he and other persons had stopped and left their cars on a plant access road at rush hour, intending to block traffic to the plant. The Court held that the Title VII plaintiff must shoulder an initial burden of establishing a prima facie case of racial discrimination. Such a burden, in the Court's view, could be met by a showing that plaintiff: (1) belonged to a racial minority; (2) applied and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. 411 U.S. 802, 93 S.Ct. 1817. The Court was careful to note that the 4-factor-showing might not apply in every Title VII case. 411 U.S. 802, n. 13, n. 14, 93 S.Ct. 1817. The Court found that burden met in the case before it, and further held that the burden then shifted to the employer to show "some legitimate, nondiscriminatory

reason" for rejection. *Id.* But the Court also found that burden satisfied on a prima facie level by McDonnell's showing that plaintiff had engaged in unlawful, disruptive conduct directed against its plant. In view of these findings, it afforded plaintiff an opportunity to show on remand that the unlawful conduct asserted by McDonnell was a mere pretext for racial discrimination. It suggested that evidence concerning plaintiff's treatment by McDonnell during a prior term as its employee, McDonnell's reactions to plaintiff's legitimate civil rights activities during that term, and McDonnell's general policy and practice with respect to minority employment would be relevant to consideration of a claim of pretext.

In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court articulated the elements of a claim and burdens of proof in a Title VII testing case, filling in the procedural void left in *Griggs*:

"In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.' *Id.*, at 432 [91 S.Ct. at 854]. This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination—has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973). If an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' *Id.* at 801 [93 S.Ct. 1817]. Such a showing would be

evidence that the employer was using its tests merely as a 'pretext' for discrimination. *Id.*, at 804–805 [93 S.Ct. 1817]." 422 U.S. 425, 95 S.Ct. 2375.

The Court did not have the opportunity in *Albemarle* to fully demonstrate the operation of the elements and burdens because that case involved only questions of the job relatedness of certain employment tests, which the court held were not shown to be job related. *Id.*

All of the above cases dealt with Title VII actions in which plaintiffs were black. The extent to which their holdings apply to white Title VII plaintiffs, who are not members of any group suffering the continuing effects of past discrimination, was the subject of *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), decided by the Supreme Court last term. In *McDonald*, the complaint alleged that plaintiffs, two white men, and a black man were jointly and severally charged with stealing 60 one-gallon cans of anti-freeze in the custody of the railroad for shipment. The complaint further asserted that while plaintiffs were discharged for their participation in the incident, the black man was retained. The Court found the case indistinguishable from *McDonnell Douglas, supra,* and held that plaintiffs had stated a cause of action under Title VII. The Court stated that white plaintiffs were entitled to the protection of Title VII "upon the same standards as would be applicable" if they had been black. 427 U.S. 280, 96 S.Ct. 2578. While the Court acknowledged the right of an employer to discharge employees for theft, it emphasized that such a right may not be exercised in a racially discriminatory fashion. It is important to note that the Court had only the complaint before it and therefore intimated no view of what might be a

permissible defense to plaintiff's claim, e. g., if defendant could show that it considered the cases of the three employees individually and reasonably decided, based on their total disciplinary and/or performance records, that the black employee was the only one of the three entitled to "another chance", a valid defense might be established. Moreover, the Court was very careful to note that it was not deciding the permissibility of any bona fide affirmative action program operated by defendant railroad. 427 U.S. 280, n. 8, 96 S.Ct. 2578, n. 8.[4]

Lower court decisions under Title VII have typically involved claims of sex and race discrimination by black and female plaintiffs. Many of these actions have been brought as class actions attacking "across the board" the employment policies and practices of particular employers. Following the lead of the Fifth Circuit, courts in these cases have been liberal in holding prima facie cases established where plaintiffs have shown: (1) past discrimination as evidenced by statistics showing the adverse hiring salary, or promotion status of blacks or women in the employer's service; and (2) criteria for personnel decisions which are either vague or subjective (such as supervisor ratings without the benefit of rating criteria) or which perpetuate past discrimination (such as department seniority or word-of-mouth-only solicitation for applicants). See, e. g., *Swint v. Pullman Standard*, 539 F.2d 77 (5th Cir. 1976) at 93, n. 36 and cases cited; *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir. 1976); *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346–347 (10th Cir. 1975); *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972); *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir. 1971). In a few isolated cases, white majority plaintiffs have gained

---

4. Similarly, in the instant case NPS does not defend the promotion of Davis over plaintiff and others as a part of any program to advance blacks to supervisory positions. Such affirmative action programs have come under increasing attack in reverse discrimination suits in which plaintiffs, usually asserting constitutional claims, have established that they have suffered at the hands of quota systems which have

the effect of favoring lesser qualified racial minorities. See, *Bakke v. Regents of University of California*, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976) and cases cited at 696, 553 P.2d at 1168, petition for cert. filed. The Supreme Court has not yet examined the constitutional or Title VII status of affirmative action minority quota plans in educational admissions or employment.

mileage toward prima facie cases by showing that affirmative action programs have resulted in statistical discrimination in reverse. See, e. g., *Reeves v. Eaves*, 411 F.Supp. 531 (N.D.Ga.1976) (Court issued preliminary injunction against further enforcement of consent decree which had produced hiring ratio of 80% black—20% white in police department in which blacks were already overrepresented).

Of course, individual Title VII plaintiffs, majority or minority, always retain the option of showing that they possessed all of the relevant characteristics of their fellow employees who were favored by the employer, thus permitting the inference that race or some other impermissible classification was a factor in their treatment. This was the showing made in *McDonald, supra*, where the complaint alleged that all employees were guilty of the same offense, but only white employees were discharged. The operation of this option in federal promotion cases is illustrated by two lower court cases. In *Abrams v. Johnson*, 534 F.2d 1226 (6th Cir. 1976), a black employee alleged that she had been twice passed over for promotion despite her top ratings on the civil service merit scale. The second time she was rejected in favor of a white woman 10 points below her on the 100-point scale who was selected before other applicants were even interviewed. The court held that a prima facie case of discrimination had been established. *Id.* at 1229–1231.

In *Parks v. Brennan*, 389 F.Supp. 790 (N.D.Ga.1974), rev'd only on issue of irreparable harm sub. nom. *Parks v. Dunlop*, 517 F.2d 785 (5th Cir. 1975), a white employee alleged that he had twice been rated at the top of the merit scale, but denied promotion when Washington had ordered a lesser qualified black and a lesser qualified Spanish American promoted. The court held that he had established a likelihood of success on the merits of his Title VII claim.

■ In summary, the above cases suggest that plaintiff must make a prima facie showing that race was probably involved in the promotion of Fred Davis over him and other candidates. He might make such a

showing by pointing to evidence that: (1) whites as a group were victims of past discrimination and that NPS used subjective criteria for promotion which perpetuated this discrimination; or that (2) he was the best qualified person for the promotion, but lost it to a black person. But plaintiff has not attempted to pursue either of these strategies. Indeed, on the record before the court, he would be doomed to failure if he did. There is no evidence that there was any discrimination against whites—the 20-member guard staff contained 5 minority guards and no minority guard supervisors. Moreover, plaintiff was rated 5th of 6 applicants for promotion, behind both whites and blacks, with respect to his qualifications for promotion. He was rated a full 10 points below the top rated applicant who received the promotion. Instead, plaintiff has attempted to show that the entire selection process, including the merit ratings themselves, was the product of racial discrimination against him. His claim is therefore analogous to the claim of pretext analyzed in *McDonnell-Douglas, supra*. In order to sustain such a claim, plaintiff must offer some evidence, direct or circumstantial, which suggests that race was an operative factor in the assignment of ratings to the applicants for promotion. Plaintiff has failed to do so—the most that could be said of his claims is that they are based on suspicions without any apparent foundation.

■■ Although plaintiff is entitled to a trial de novo as opposed to substantial evidence review of the administrative record on his claim, *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct.1949, 48 L.Ed.2d 416 (1976), summary judgment may nonetheless be awarded against him if all of the evidence before the court discloses no genuine issue of material fact. Rule 56, Fed.R.Civ. Pro.; *Coopersmith v. Roudebush*, 170 U.S. App.D.C. 374, 517 F.2d 818 (1975); see also *Hackley v. Roudebush*, 171 U.S.App.D.C. 376, 520 F.2d 108, 156–159 (1975); *Sperling v. United States*, 515 F.2d 465, 481–482 (3d Cir. 1975). In this case, plaintiff has had a full opportunity to avail himself of dis-

covery procedures in this court to supplement the administrative file and hearing record, and has done so by taking several depositions. However, viewed in the light most favorable to plaintiff, the entire record contains no evidence that plaintiff was rated adversely or denied promotion *because of his race.* In fact, the record contains much evidence showing racially neutral, performance-related reasons for the promotion of Fred Davis over plaintiff. Therefore, summary judgment is appropriate. *Coopersmith, supra; Hackley, supra.* The specific complaints raised by plaintiff in connection with the selection process will be separately reviewed.

Plaintiff initially points to the recission of the first selection after complaints of race discrimination by Fred Davis and the ensuing conduct of Lieutenant Commander Delashmitt in excusing Davis from a guard meeting and asking for reactions to Davis as supervisor as evidence of racial discrimination. There is absolutely no evidence, however, that either of these events had any impact upon the *second* selection process, which was conducted independently and did not involve Delashmitt. Any inference of racial discrimination based on these facts would amount to pure speculation.

■ Plaintiff next attacks what he terms "prejudicial grading" in the assignment of ratings to the applicants in the second selection process. He submits that: (1) he was given three satisfactory ratings by Chief Carpino and Luther Woodward, the two supervisors that appraised him for promotion, that were not justified by his performance; and (2) he was not given sufficient credit for his past experience by civil service personnel who reviewed his qualifications. Neither submission is fairly supported by the record, and, critically, neither suggests any factual issue with respect to *racial* discrimination. Even assuming that plaintiff's criticisms of his personnel ratings are meritorious [5], there is no evidence that Carpino and Woodward did not rate all applicants, black or white, consistently, or that either of them manipulated their ratings to favor blacks. Carpino, who rated all applicants, rated everyone generally average except for Edward Smallfoot, a white man, whom he rated above average. Woodward rated only plaintiff and William Talbert, a black man, and rated both generally average. There is no evidence, direct or circumstantial, that Carpino or Woodward, both of whom were white, were prejudiced against plaintiff, who was also white, because of race. Indeed, plaintiff himself testified that he had no reason to believe that either Woodward or Carpino treated him adversely because of his race. (Plaintiff's Deposition, pp. 24–25).[6]

In addition to challenging his two personnel ratings, plaintiff also attacks the evaluation of his qualifications by civil service personnel. In support of this attack, plaintiff does not assail the neutrality of the

---

**5.** Plaintiff attacks his ratings in the general areas of leadership, cooperation, and attendance on grounds that: (1) he was never told he was lacking in leadership; (2) his supervisor complained about the same problems in security administration that he did; and (3) he only took time off for reasons of illness. Luther Woodward fully explained his evaluation of plaintiff at the administrative hearing, giving neutral reasons and examples of plaintiff's performance to justify his ratings. (Hearing Transcript, Doc. # 24, Tab 8, pp. 153–160.)

**6.** Plaintiff also attacks Woodward's rating on the ground that Woodward rated him significantly higher 2½ months later, after the promotion rating. The record does not support plaintiff's assertion that the two ratings were significantly different. Woodward was rating plaintiff on different evaluation forms with different criteria and different scales, one a 5-point scale and the other a 6-point scale. The differences in Woodward's ratings of plaintiff, which amounted to one point, are not overwhelming, and are plainly insufficient to suggest that the earlier rating was racially motivated. Moreover, any claim that Woodward's rating was a pretext designed to hide racial discrimination is devoid of any support in the record. For example, there is no evidence that: (1) the ratings of Woodward differed from the first selection process to the second in a way which favored black applicants; (2) Woodward, or anyone else, was under any inside or outside pressure to select a black applicant in the second selection process. Under these circumstances, there can be no inference of pretext. Cf. *McDonnell Douglas v. Green, supra.*

rating process or of civil service personnel who assigned the ratings. He simply asserts that he is familiar with Davis' qualifications and that his are equal except for a two-week course in physical security which he had and Davis did not. Nothing in the record shows any inconsistency in the evaluation of applicants' qualifications which would suggest discrimination in favor of black applicants. In fact, there was more than ample basis upon which a reasonable rater could find that Davis was better qualified than plaintiff in: (1) educational background—Davis' application gives specific evidence of higher education in police science; and (2) supervisory experience—Davis' application shows experience as a guard supervisor.

■ Since plaintiff has failed to point to any evidence which would support an inference that racial discrimination played a role in the merit rating process, his claim must fail based on the relative ratings alone. The promotion was awarded to the top rated, and therefore best qualified, applicant. Plaintiff was rated only 5th of 6 applicants, behind both blacks and fellow whites. That the best qualified person as determined by a neutral and objective merit rating process was awarded the promotion is sufficient to defeat a claim of racial discrimination. See, *Simmons v. Schlesinger,* 398 F.Supp. 1327 (E.D.Va.1975); Cf. *Cooper v. Allen,* 493 F.2d 765 (5th Cir. 1974); *Cates v. Johnson,* 398 F.Supp. 605 (W.D.Pa.1975).

■ The interview process provides an independent basis on which plaintiff's claim must be denied. Plaintiff contends that he and Davis were about equally qualified. Commander Beals, the chairman of the panel who interviewed the applicants, testified that Davis was more confident in his interview than plaintiff and that confidence was an important attribute of a guard supervisor. Plaintiff himself acknowledged that he stammered and did not perform well at the interview. The interview, therefore, provides an additional, neutral basis upon which Davis was distinguished from plaintiff.[7]

■ In summary, plaintiff has directed the court to no evidence which would permit a trier of fact to draw an inference of racial discrimination in the promotion of Fred Davis over him. He suggests that such an inference may be drawn from the facts that: (1) two black men made a racial discrimination complaint which resulted in the reversal of the first selection process; and (2) certain aspects of his personnel ratings and interview in the second selection process did not reflect his qualifications and (3) one of the complaining blacks received the promotion. The problem with the inference is that there is no necessary relationship, causal or otherwise, between the first, and the second and third facts. The second selection process was conducted independently and there is no evidence that any errors, problems, or biases in the process were the result of a racial reaction to the first process. To the contrary, the record shows that plaintiff lost the promotion to a better qualified candidate.[8]

---

7. Plaintiff has also attacked the selection board and the interview process. Again, his attacks do not permit an inference of racial discrimination. Although plaintiff does not contend that any members of the Board were prejudiced against him because of race, he asks the Court to draw an inference of racial discrimination from the composition and procedures of the board. He suggests that Chief Carpino's presence on the Board, coupled with his selective questioning of candidates, resulted in racial discrimination. While Carpino was aware of the first selection process and the racial problem, there is no suggestion that he used his position on the Board to indicate a preference for any applicant, black or white. In fact, Commander Beals, the board chairman, specifically testified that Carpino was scrupulously neutral and was the last board member to express any opinion or vote on the applicants. Plaintiff also asserts that his interview was not fairly conducted because he was asked only four questions and interviewed for only six minutes. Even assuming the validity of this complaint, it, like the others, does not show racial discrimination. There is no evidence that plaintiff was evaluated or treated any differently from Davis or other applicants in any part of the selection process because of race.

8. In *Chandler v. Johnson,* 515 F.2d 251 (9th Cir. 1975), the Court stated that notwithstanding alleged defects in federal personnel procedures, a black female employee's promotion discrimi-

For the reasons stated above and good cause appearing:

IT IS HEREBY ORDERED that defendants' motion for summary judgment be and hereby is granted; and that the complaint be and hereby is dismissed with prejudice, each party to bear its own costs.

nation claim failed upon a showing that the male receiving the promotion had greater seniority and 2-point edge over the female in merit rating. The Court found these factors to be "legitimate, nondiscriminatory reason[s] for the challenged personnel action." 515 F.2d 254. Although the decision of the Court, which affirmed a summary judgment, was reversed by the Supreme Court in *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), reversal was based solely on the Ninth Circuit's conclusion that a federal employee was not entitled to a trial de novo in the district court on a Title VII claim. When a federal employee has received the full benefits of trial de novo, i. e., the availability of the discovery process of the district court, but is still unable to demonstrate a genuine issue of material fact, summary judgment remains appropriate in accordance with the Ninth Circuit's reasoning.