**Robert L. JONES, Plaintiff,**

v.

**J. William MIDDENDORF, II, Secretary of the Navy, Defendant.**

No. 76–302–C.

United States District Court,
E. D. Oklahoma.

July 13, 1978.

Roger O. Housley, McAlester, Okl., for plaintiff.

Betty Outhier Williams, Asst. U. S. Atty., Muskogee, Okl., for defendant.

## MEMORANDUM OPINION

MORRIS, Chief Judge.

Plaintiff brings this action under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The parties agree that plaintiff has exhausted his administrative remedies and that this court has jurisdiction under 42 U.S.C. § 2000e–16(c).

Plaintiff claims that defendant discriminated against him in his employment on the basis of race in promoting another applicant instead of plaintiff to fill the position of supervisory computer operator at the Naval Ammunition Depot in McAlester, Oklahoma. Plaintiff alleges that he was the most qualified applicant for the vacant position

and that the other applicant was promoted for the reason that he is black and plaintiff is caucasian. Plaintiff contends that even if the record should show that both applicants were determined to be equally qualified by the rating panel, plaintiff should nevertheless have been promoted if the merit promotion program and the rating schedule for the vacant position were followed, and plaintiff alleges that the commanding officer who made the selection failed to follow these and failed to follow standard procedure in the selection process in that he did not apply the provision for breaking ties in the ranking of applicants. Plaintiff further alleges that the only reason that the black male was selected was that he was of a minority race and because the commanding officer wished to achieve racial balance at the level above GS–7.

Defendant admits that the commanding officer made the selection of the black applicant over plaintiff and that such a selection is ordinarily made by the supervisor under authority delegated to the department heads. Defendant alleges that the commanding officer made the selection himself because the department head had made a discriminatory preselection of the plaintiff. Defendant claims that the black applicant was selected because he was best qualified or at least equally as qualified as plaintiff. Defendant contends that the tie-breaking rules only apply to the rating panel's certification of the three most qualified applicants for a particular position if more than three have applied for that position, and that the selection official has discretion to choose any one of the three applicants who have been certified as qualified for the position. The case was tried to the court sitting without a jury on April 4, 1978, in Muskogee, Oklahoma.

On July 23, 1974 vacancy announcement No. 22 was issued by the personnel office of the Navy Ammunition Depot in McAlester, Oklahoma, soliciting applications for the position of supervisory computer operator, GS–332–09, Plaintiff's Exhibit No. 1, as a result of request No. 72 of July 15, 1974. Defendant's Exhibit No. 1. The following three applicants were placed on the certificate of eligibles for promotion by the rating panel: Robert L. Jones, William O. Kirk and Pheotene A. Carney. Defendant's Exhibit No. 1, at 2. Plaintiff Jones and Kirk both received a numerical score of 100 and Carney received a score of 97. All three were listed as highly qualified for the GS–9 position. Carney is a female, Kirk is a black male, and plaintiff is a white male.

Robert Jones has been a supervisory computer technician, which is a GS–8 position, since 1968 at the military facility in McAlester, Oklahoma, which at the time the events occurred that are material to this action was the Naval Ammunition Depot, but has since become the Army Ammunition Depot. Thus, when Jones applied for the GS–9 position he had six years experience as a supervisory computer technician. From 1967 until 1968 he was a digital computer systems operator at the Naval Ammunition Depot. While working in that capacity his position was rated as GS–5 and later as GS–6. From 1960 until 1967 plaintiff was an EAM (electrical accounting machine) operator at the Naval Ammunition Depot. This was a GS–4 position. See Plaintiff's Exhibit No. 2.

Prior to 1960, plaintiff was employed at the Tinker Air Force Base in Oklahoma as a tabulating equipment operator supervisor from March 1959 until August 1960, and as a tabulating equipment operator from January 1958 until March 1959. From July 1957 until November 1957 Jones worked as tabulating equipment operator in McAlester which, except for the change in title, was the same position as that of an EAM operator, which plaintiff subsequently held between 1960 and 1967. When the GS–9 position opened up in 1974, plaintiff had seventeen years experience in computer work and computer related work, fourteen of which had been at the McAlester facility. While EAM work is not the same as computer work it is generally related. An electric accounting machine (EAM) is a card operated device while computers which are now generally in use are strictly electronic, use magnetic tapes and discs, operate from memory and are more sophisticated. Not

counting plaintiff's EAM work, he had seven years experience in computer work when he applied for the GS–9 position in 1974. At that time he had seven to eight years supervisory experience, namely, from 1968 until 1974 as supervisory computer technician, see Plaintiff's Exhibit No. 2, Attachment No. 1A, and from August 1967 until October 1968 as a supervisory digital computer operator. See Plaintiff's Exhibit No. 2, Attachment No. 1. He had approximately 800 to 900 classroom hours of technical training, Plaintiff's Exhibit No. 2, Attachment No. 4, and 310 hours of managerial training. The government gave him leaves of absence to take these courses. In his GS–8 position plaintiff mainly performed planning and organizing functions and not much hands-on work. Hands-on work was the exception, not the rule. However, plaintiff had fourteen months of hands-on experience with the Honeywell 200 series computer as a computer operator.

Plaintiff was given a sustained superior performance award by the commanding officer of the Naval Ammunition Depot in April of 1967. Plaintiff's Exhibit No. 2, Attachment No. 7. He also received the "wise old owl award" (2000 hours accumulated sick leave) in April, 1971. Plaintiff's Exhibit No. 2, Attachment No. 6. Plaintiff has been with the military since November, 1945. Federal employees with service of less than 3 years are entitled to 4 hours of sick leave for every 2 weeks. Persons who have been employed between 3 and 15 years are entitled to 6 hours per 2 weeks, and persons employed more than 15 years are entitled to 8 hours per 2 weeks. Frequency of sick leave taken is significant in that it not only may show the status of an employee's health, but it may be indicative as well of an employee's devotion to and interest in his position and of his reliability.

The position of supervisory computer operator, GS–332–09, became available when Robert Williams, who had previously held it, was promoted to a GS–10 position upon the retirement of Harold C. Cloer. The job description of the vacant GS–9 position called for 45 percent supervision, 35 percent managing the operation and 20 percent hands-on operation. Plaintiff's Exhibit No. 8. Thus, the position contemplated 80 percent supervision and management of operation and 20 percent hands-on operation. The position paid $12,167.00 per annum, as a GS–9, step 1 position. In 1974 plaintiff was ranked in his position as a GS–8, step 5. There was no guarantee that plaintiff would begin at step 5 of the GS–9 position if he were to receive the promotion. However, plaintiff would have received promotion money in any event; in other words he would have commenced at least at such a step at the higher grade as would have assured him of earning more upon promotion than he did as a GS–8, step 5.

William O. Kirk was a computer operator, GS–7, on the Honeywell 200 series computer at the Naval Ammunition Depot when he applied for the GS–9 position in 1974. Plaintiff's Exhibit No. 7. Kirk was at grade GS–7 for 3 years, and at GS–6 and GS–5 for one year each. From October 1965 until February 1966 Kirk was employed with General Electric Credit Corporation as a computer operator in Oklahoma City, and from October 1960 until May 1965 he was an EAM operator, GS–4, at the Tinker Air Force Base in Oklahoma. Kirk had supervisory experience during his four years of military service from 1954 to 1958 in the United States Air Force. See Plaintiff's Exhibit No. 7. In connection with his employment as a computer operator at the Naval Ammunition Depot Kirk had no supervisory experience other than that which is the normal duty of an operator, that is, training new employees coming into the shift. He did not have any managerial courses up until 1974 but did have computer courses prior to 1974. He had technical training by August 1974. Kirk took courses at the Eastern Oklahoma State College in Wilburton, Oklahoma, between 1966 and 1972. He testified that he received an associate degree in data processing in 1972, but he did not list such a degree in his application of July 30, 1974 for the GS–9 position. See Plaintiff's Exhibit 7.

Earl Dunn was the personnel officer at the Naval Ammunition Depot for twenty-

five years. He retired in April, 1976. When a vacancy occurs the supervisor requests that the position be filled and that the certificate of eligibles issue. As a result of the supervisor's request a vacancy announcement is issued. See Plaintiff's Exhibit No. 1. A job description prepared by the supervisor of the vacant position is forwarded to the personnel office. After the applications are received in the personnel office they are reviewed by a personnel specialist for the purpose of eliminating those applicants who do not even remotely qualify for the position to be filled. The remaining applications are then referred to the rating panel together with instructions prepared in the personnel office regarding the method to be used by the panel in rating the applicants. Defendant's Exhibit No. 2. The instructions relating to the GS-332-09 position were prepared by Tom Fereday under Dunn's supervision. The members of the rating panel were trained to be careful to insure that their ratings are correct, but were supervised only in the sense that the personnel office was available if its assistance was requested. Different panels were used in connection with different positions.

Under the promotion plan in effect in 1974 the rating panel reviewed each individual application and applied a numerical score to it. Performance appraisals submitted by an applicant's supervisors were then given to the rating panel after their ratings had been made for inclusion in the raw score. See Defendant's Exhibits Nos. 3 & 4. A certificate of eligibles was then issued showing the three best qualified applicants. Defendant's Exhibit No. 1. The head of the department in which the position was to be filled was the selection official under the merit promotion program in effect in 1974. The selection authority could be redelegated by the department head to a subordinate supervisor. Plaintiff's Exhibit No. 6, Par. 21e. The selection official could select any one of the applicants shown on the certificate of eligibles and did not have to select the person with the highest score.

According to the plan in effect at the time of the promotion in question ties in ranking were to be broken on the basis of (a) length of pertinent qualifying experience and (b) length of service (based on service computation date) in that order. Plaintiff's Exhibit No. 6, par. 16; Defendant's Exhibit No. 2. While there is no indication in the merit promotion plan that the application of the tiebreaker was limited to certain situations, Earl Dunn testified that he took it for granted that it was only applied when there were more than three applicants and it became necessary to break a tie in order to determine the third applicant to be included on the certificate of eligibles. Similarly, Edward Turner, who is in charge of recruiting in the personnel office, stated that the purpose of the tiebreaker was to name not more than three persons to the selecting official so as to comply with the promotion plan.

The personnel office refers the certificate of eligibles to the department head for selection of the person to be promoted. When Earl Dunn received the certificate he took it personally to the commanding officer, Captain Paul E. Smith, pursuant to a regulation requiring apprisal of the equal employment opportunity (EEO) deputy whenever a member of a minority or a female was on the certificate. Since the EEO deputy at the depot had just retired Dunn went to the commanding officer in his place. He went to Captain Smith's office in early August, 1974, and discussed the promotion with him for approximately one-half hour. He took with him for Captain Smith's review the certificate of eligibles, and the rating sheets and applications of the three applicants listed on the certificate, Kirk, Jones and Carney. Captain Smith had access to all records. They discussed at considerable length the ratings and the selection procedures.

Previously, Dunn had called Kirk on the last day applications for the position could be filed to insure that his application would be received if he intended to apply. He did not call plaintiff. Kirk had previously applied for a position in the personnel office and was put on the certificate of eligibles as

one of the best qualified. However, Dunn did not select him because he thought the person he selected was better suited for the particular position and would do a better job. Dunn had a meeting with Kirk and told him that he would not be selected for the personnel job. He told Kirk that his line of work was in the computer system and that he ought not to change after they had spent money on him to train him in that field. Kirk had an appeal for discrimination in his hand when he went to see Dunn, but subsequent to the meeting he did not process any appeal for discrimination for not having been selected for the personnel position. Kirk denied on cross-examination that he had a piece of paper with him when he went to see Dunn, but the court finds his denial not credible and believes Dunn's contradictory testimony in this regard to the effect that Kirk did carry a discrimination appeal with him when he came to see Dunn. Dunn testified that he did not make any promises to Kirk during their conference and that he did not tell Smith that Kirk was promised anything. Shortly after Kirk was turned down for the personnel job the GS–9 position became available, whereupon Dunn called Kirk. Dunn told Captain Smith that he had turned Kirk down in connection with the personnel position. Kirk was a forceful individual, an activist, who presented a number of situations of alleged discriminations at EEO committee meetings.

Mae F. McRee is at the present time and was in 1974 the head of the data processing department at the McAlester depot. She had been employed there for 24 years. Prior to that she worked for 3 years at the Tinker Air Force Base. She has been the department head since 1967 and has had a GS–13 grade since 1968. She has supervised both Jones and Kirk ever since they have been employed at the depot. She hired Kirk as a computer operator and trained him. The written official job description, plaintiff's Exhibit No. 8, describes the GS–9 position as vacated by Robert Williams. Job descriptions are reevaluated annually, but there were no amendments to the GS–332–09 job description of January 19, 1971 between 1971 and 1974. In 1974 Robert Williams was Kirk's immediate supervisor and Mae McRee was plaintiff's supervisor.

In Mae McRee's department employees were ordinarily promoted one grade at a time. She had begun as a GS–2 and was promoted one grade at a time up to GS–13. Harold Cloer started as an operator trainee and was promoted one grade at a time up to GS–11. Williams, who succeeded to Cloer's position upon the latter's retirement, progressed to GS–10 and not GS–11 which was Cloer's grade. The GS–332–09 position was a two grade interval position which meant that both GS–7 and GS–8 employees were eligible to compete for it. McRee had selection authority pursuant to paragraph 21e of the merit promotion program, Plaintiff's Exhibit No. 6, and she had previously exercised her authority as selection official. She had selected both Cloer and Williams and she fully expected to make the selection of Williams' successor to the GS–9 position.

Both McRee and Williams gave supervisory appraisals of Jones and Kirk. Defendant's Exhibits Nos. 3 & 4. The examining plan for the GS–332–09 position provided that the following five elements were to be used to evaluate an applicant's supervisory experience:

I. Ability to Supervise

II. Technical Knowledge of Subject Matter Field

III. Ability to Plan and Organize the Work

IV. Ability to Work Effectively with Others

V. Ability to Meet Deadline Dates Under Pressure

Defendant's Exhibit No. 2. The rating panel gave both Kirk and Jones the maximum credit points of four on each of the five elements. Defendant's Exhibits Nos. 3 & 4. The past performance appraisals and the corresponding credit points as to each of the five elements were as follows:

McRee's Appraisal

| Elements | Evaluation and Point Value | | | |
|---|---|---|---|---|
| | Kirk | | Jones | |
| I | Above average | 3.0 | Above average | 3.0 |
| II | Excellent | 3.5 | Excellent | 3.5 |
| III | Excellent | 3.5 | Excellent | 3.5 |
| IV | Excellent | 3.5 | Outstanding | 4.0 |
| V | Excellent | 3.5 | Excellent | 3.5 |
| | | 17.0 | | 17.5 |

Williams' Appraisal

| Elements | Evaluation and Point Value | | | |
|---|---|---|---|---|
| | Kirk | | Jones | |
| I | Above average | 3.0 | Above average | 3.0 |
| II | Outstanding | 4.0 | Excellent | 3.5 |
| III | Excellent | 3.5 | Excellent | 3.5 |
| IV | Excellent | 3.5 | Outstanding | 4.0 |
| V | Excellent | 3.5 | Outstanding | 4.0 |
| | | 17.5 | | 18.0 |

Defendant's Exhibits Nos. 3 & 4. While plaintiff thus received a higher score on both performance appraisals, both applicants received the same numerical rating of 100 by the rating panel on account of the manner in which the performance appraisal points and the credit points allowed by the rating panel were combined in accordance with the table contained in the examining plan for the GS–332–09 position, which table "allows the Rating Panel's rating to take precedence over the performance appraisals, unless the performance appraisal if (sic) more favorable to the candidate." Defendant's Exhibit No. 2, at 6. According to "Merit Promotion Plan C," awards constitute one of five criteria to be used in evaluating candidates. Plaintiff's Exhibit No. 6, Enclosure (3), at 2.

In Ms. McRee's view, the difference between Kirk and Jones was that Kirk was a technician while Jones was a manager. Thus, in her handwritten appraisals she stated that Kirk was an excellent computer operation *technician*, and that Jones was extremely helpful on the *management* team. While she was aware of unfavorable matters with respect to Kirk she did not want to put these matters in writing and include them in her appraisal for the rating panel to see. Since she fully expected to make the selection for the GS–9 position at the time she gave her appraisal of Kirk she saw no need to include within it any derogatory matters.

While Kirk's leave record between 1972 and early 1974 does not reflect that he was ever given any leave without pay or ever was absent without leave, or that his leave was not approved by his superiors, it does reflect that he took a lot of annual leave during 1972 and 1973. Plaintiff's Exhibit No. 5. As Captain Smith acknowledged, he missed at least one day every two or three weeks in 1972. Cloer, McRee and Williams frequently counseled Kirk regarding the manner in which he took leaves, in that he would not come to work and would not call in until several hours into his shift. Kirk had done this ever since he had gone to work at the computer department. After a consulting session his performance with respect to leaves would become better for a while, but thereafter he would fall back into his bad habits. Thus, on December 2, 1969, Cloer sent a letter to Kirk regarding his excessive tardiness. Plaintiff's Exhibit No. 9. The letter did not constitute a formal disciplinary action, however. Cloer went to Kirk's house twice to check up on him and discovered that Kirk was getting a carburetor for his car and that he was at a tire shop. One reason for Kirk's numerous leaves was the fact that he took classes on his own time. In contrast, plaintiff had an outstanding leave record as evidenced by the "wise old owl award" and the handwritten appraisals by Williams and McRee. Plaintiff's Exhibit No. 2; Defendant's Exhibit No. 4.

Kirk received a number of letters and phone calls from creditors regarding his alleged indebtedness to them. Plaintiff's Exhibit No. 4. Until 1973 creditors contacted an employee relations specialist at the depot who in turn contacted the individual employee. Since 1973 creditors were to contact the employee's supervisor who then counseled the employee regarding his debts. The indebtedness record with respect to Kirk kept in the employees' relations office, Plaintiff's Exhibit No. 4, shows that creditors contacted Kirk and his supervisors regarding his alleged indebtedness but does not show whether the debts were ever confirmed. McRee had counseling sessions with Kirk regarding his alleged indebtedness during which he disputed some debts

and acknowledged others. Jones did not have any of these problems regarding indebtedness.

Captain Paul E. Smith was the commanding officer at the Naval Ammunition Depot from June 1974 until June 1977, and as such was responsible for its entire operation. When Earl Dunn went to Captain Smith's office in early August 1974, to discuss the applications for the GS–332–09 position he told the captain: "I don't envy your position." Smith had met Kirk previously at an EEO executive committee meeting. The captain had two meetings with Kirk,[1] but never interviewed plaintiff. Smith had all files available for his review and he discussed the applicants with Leonard Thom, Earl Dunn and Harvey Brashier who was in charge of labor relations.

Smith spent two hours reviewing the applications and rating sheets before he summoned Ms. McRee to his office around August 8 or 9, 1974. He told her that he was looking at the applications because a member of a minority and a female were involved. Smith asked her whom she would choose and she told him that she would select Jones on the basis of his stability, leave record, awards and managerial ability. Upon Smith's inquiry she told him that she could work congenially with any of the three applicants. While the department head usually delegates his selection authority to the supervisor over the position to be filled, which would have been Williams in this instance, McRee informed the captain that she and Williams would confer on the selection since Williams had himself just been promoted to the supervisory GS–10 position. During a conversation between McRee and Williams prior to the release of the ratings by the rating panel, Williams told McRee that he preferred Carney over Kirk because he had used her as his replacement when he could not be there. Williams supervised both Carney and Kirk but not Jones, who was on the night shift.

Ms. McRee made Smith aware of Kirk's poor leave record and the problems regarding his indebtedness. She told the captain that Kirk had a poor attitude, that he was subject to angry outbursts regarding unfair promotions, and she expressed her concern over his emotional loyalty to the black community as overshadowing his loyalty to the Navy. She also informed him that Kirk received remuneration from the Veterans Administration as well as the Navy. She expressed the view that Kirk could compete for the GS–8 position if Jones were selected for the GS–9 position. Smith did not attach any credibility to her reasons for choosing Jones over Kirk, since he rejected as unsatisfactory her explanation that she did not want to put any matters unfavorable to Kirk in the written appraisal because she expected to be the selection official. The captain then informed her that according to a message he received from the Secretary of the Navy, Plaintiff's Exhibit No. 10, it was his duty to promote a minority applicant who was equally qualified in order to alleviate the poor supervisory ratio of minorities at the depot. At the time there was one black wage grade supervisor and no black GS supervisor at the depot.

Captain Smith told Ms. McRee that Kirk and Jones were equally qualified or that Kirk was maybe even more qualified. He asked her if there would be dissatisfaction among the other employees if Kirk were selected, and she said that such a selection would result in morale problems since the employees were aware of Kirk's shortcomings. She told him that the ratings were questionable and should be reevaluated and brought the difference in experience to his attention. He did not examine Kirk's leave and debt records in her presence, and he did not ask for or see Kirk's leave record. Captain Smith gave McRee a direct order to sign the form effecting Kirk's promotion which she did under protest since she told him that she could not announce the decision as her own. Plaintiff's Exhibit No. 3. Smith thereupon wrote some comments on

---

1. Ms. McRee testified that Smith told her that Kirk had been in his office five times and that he wanted Kirk to get into the night shift by

promoting him to the GS–9 position so that he could not be so vocal in his EEO outbursts.

the reverse side of the form setting forth the reason for his action. He told her that Kirk was the highest paid black on the base and that he needed one in the supervisory realm. Smith pointed out to her that Kirk had applied for other jobs previously and had been passed over. Kirk's promotion was effective August 18, 1974.

Mae McRee was convinced that Jones was the most qualified applicant for the position and she felt she could not in good conscience defend Kirk's promotion, since the better qualified Jones was being passed over and was not likely to receive another opportunity until someone retired. In her opinion race was definitely the factor in Smith's selection of Kirk. McRee's selection official status had never been rescinded previously. Both Smith and Dunn acknowledged that the supervisor who had worked together with the individual applicant would be in the best position to judge his qualifications. Captain Smith felt that she could not make the proper decision and that she had made a preselection in favor of Jones. He was aware of plaintiff's "wise old owl award," and superior performance award of 1967, but was of the view that not much weight ought to be given to them, since it takes twenty years to acquire the former, and with respect to the latter, old awards are not entitled to much weight. Smith knew that Jones had been in a supervisory capacity at least since 1968. He also attached no significance to Kirk's leave and debt records brought to his attention by Mae McRee, since in his view the leaves must have been approved by Kirk's supervisor or else disciplinary action would have been brought against him, and since the indebtedness records with respect to Kirk did not constitute evidence of debts actually owed by him. The fact that Kirk may have owed money and had problems with creditors was not important in Smith's view. Similarly, Smith was not impressed with Cloer's letter regarding Kirk's excessive tardiness, because it was written five years before the promotion and was not a formal letter of caution. Captain Smith testified that he would look for the following qualities in a supervisor: technical knowledge,

honesty, integrity, leadership ability and aggressiveness. He acknowledged that enjoying the respect of others is related to one's leadership ability.

Mae McRee testified that it appears that the GS-9 position which Kirk presently holds will be phased out, but that the government will attempt to find him a comparable GS-9 position. Furthermore, Kirk could bump someone with a lower grade, and if he took a lower grade position in McRee's department he would be assured of receiving his present GS-9 pay for two years. There was only one person adversely displaced when the depot was converted from the Navy to the Army.

Jose Lopez arrived in McAlester on September 16, 1974 to become the equal employment opportunity officer at the Navy Depot. His duties, which consisted primarily of advising the commanding officer of the equal employment opportunity laws and on an affirmative action program, accordingly commenced subsequent to the events involved in this case. When Kirk applied for the GS-9 position he had the highest grade of any black employee at the depot. There were no black GS supervisors, and there was only one blue collar black supervisor on wage rate. The affirmative action plan in effect in 1974 was prepared before Lopez arrived. See Defendant's Exhibit No. 5.

It is the policy of the Navy to execute equal opportunity in employment, to implement affirmative action in order to bring promotions into balance, to determine where an imbalance exists and to attempt to alleviate it. This means, as a practical matter, that it is to be insured that the candidates on the certificate of eligibles were properly rated, and that the minority member involved truly belongs on the best qualified list. In this regard Lopez testified that he would have checked all the available documents and would have gone behind the documents and checked all pertinent information. He would not rely on the ratings or the rating panel. The selection official should give serious consideration to a minority member appearing on the certif-

icate of eligibles. However equal employment opportunity is not just for minorities, but applies to everyone including whites.

In Lopez' view there was a prior racial imbalance at the depot since there were only two male blacks and four black women in the entire GS system in McAlester which consisted of 300 employees. In the recruiting area (the ten counties surrounding the depot) there were 10 percent blacks, but the GS system at the depot did not have that percentage of blacks and had no black supervisors. It is not the function of the EEO officer to suggest to the selection official whom to select but only to bring to his attention the relevant data under the affirmative action program.

42 U.S.C. § 2000e–16(a) provides in pertinent part:

> (a) All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of Title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin.

The definition of military departments in 5 U.S.C. § 102 includes the Department of the Navy. 42 U.S.C. § 2000e–16 further provides in relevant part:

> Civil action by employee or applicant for employment for redress of grievances; time for bringing of action; head of department, agency, or unit as defendant.
>
> (c) Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Civil Service Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or

with the Civil Service Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

> Section 2000e–5(f) through (k) of this title applicable to civil actions
>
> (d) The provisions of section 2000e–5(f) through (k) of this title, as applicable, shall govern civil actions brought hereunder.
>
> Government agency or official not relieved of responsibility to assure nondiscrimination in employment or equal employment opportunity
>
> (e) Nothing contained in this Act shall relieve any Government agency or official of its or his primary responsibility to assure nondiscrimination in employment as required by the Constitution and statutes or of its or his responsibilities under Executive Order 11478 relating to equal employment opportunity in the Federal Government.

42 U.S.C. § 2000e–5 provides in pertinent part:

> Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders
>
> (g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for

the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

.    .    .    .    .

Attorney's fee; liability of Commission and United States for costs

(k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

See also Exec. Order No. 11478, Aug. 8, 1969, 34 Fed.Reg. 12985, as amended by Exec. Order No. 11590, Apr. 23, 1971, 36 Fed.Reg. 7831, reprinted in 42 U.S.C.A. § 2000e app., at 286 (1974).

█ It is settled that white employees may bring discrimination suits under Title VII of the Civil Rights Act, McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), and this right extends to white federal employees. Haber v. Klassen, 540 F.2d 220 (6th Cir. 1976) (per curiam). It is also settled that section 717(c) of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16(c) "accords a federal employee the same right to a trial de novo as private-sector employees enjoy under Title VII." Chandler v. Roudebush, 425 U.S. 840, 864, 96 S.Ct. 1949, 1961, 48 L.Ed.2d 416 (1976). Accord, Blondo v. Bailor, 548 F.2d 301, 304 (10th Cir. 1977); Abrams v. Johnson, 534 F.2d 1226 (6th Cir. 1976).

█ The plaintiff in a Title VII action must carry the initial burden of establishing a prima facie case of employment discrimination. The burden then shifts to the defendant to articulate some nondiscriminatory reason for the action taken. Thereafter plaintiff must be given the opportunity to prove that defendant's assigned reason for taking the challenge action was a pretext or discriminatory in its application. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 807, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Abrams v. Johnson, 534 F.2d 1226, 1231 (6th Cir. 1976); Mellick v. EEOC, 410 F.Supp. 736 (W.D.Pa.1976); Napper v. Schnipke, 393 F.Supp. 379, 385 (E.D.Mich. 1975). While the Supreme Court of the United States set forth in McDonnell Douglas how a plaintiff may go about establishing a Title VII prima facie case,[2] the Court acknowledged that the "facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. 802 n. 13, 93 S.Ct. at 1824.

█ In the specific context of alleged discrimination in connection with a promotion, an award of retroactive promotion and

2. The Court said plaintiff may establish a prima facie case
    by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
    411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

back pay [3] is inappropriate unless the court finds that the plaintiff would have been promoted but for the discrimination. *Day v. Mathews,* 174 U.S.App.D.C. 231, 530 F.2d 1083 (1976). *Contra, Cramer v. Virginia Commonwealth University,* 415 F.Supp. 673, 681 (E.D.Va.1976) (male plaintiff not required to show that but for preferential treatment he would have been hired over female applicants); *cf. Flanagan v. President & Directors of Georgetown College,* 417 F.Supp. 377, 385 (D.D.C.1976) (plaintiff not required to prove that he would have received a higher scholarship but for the law center's discriminatory financial aid policy). It has been held in this connection that "monetary relief should be denied a Title VII plaintiff if his qualifications were such that he would not, even absent the discrimination, have been selected for the position in question." *Rogers v. EEOC,* 179 U.S.App.D.C. 270, 551 F.2d 456 (1977), *rev'g* 403 F.Supp. 1240 (D.D.C.1975). A prima facie showing of discrimination shifts the burden to the employer to prove that the applicant would not have been selected for the position in any event, even absent discrimination, and the plaintiff/applicant must prevail unless the employer proves its case by clear and convincing evidence. *Day v. Mathews,* 174 U.S.App.D.C. 231, 233, 530 F.2d 1083, 1085 (1976).

It is clear that in the context of sex discrimination a prima facie case is not established by the mere proof that a qualified man was promoted over a qualified woman. *Olson v. Philco-Ford,* 531 F.2d 474 (10th Cir. 1976). Similarly, the mere fact that a black is selected over a white, without more, is not indicative of discriminatory conduct towards the white person. *Mellick v. EEOC,* 410 F.Supp. 736, 739 (W.D.Pa. 1976). Rather, plaintiff must offer some evidence, direct or circumstantial, which suggest that race was an operative factor in the selection. *Mosley v. United States,* 425 F.Supp. 50, 58 (N.D.Cal.1977).

It is no longer open to question that reverse discrimination is forbidden by the United States Constitution and is actionable under Title VII. *Regents of the University of California v. Bakke,* —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216 (5th Cir. 1977); *Chance v. Board of Examiners,* 534 F.2d 993 (2d Cir. 1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 429 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Mosley v. United States,* 425 F.Supp. 50 (N.D.Cal.1977); *Cramer v. Virginia Commonwealth University,* 415 F.Supp. 673 (E.D.Va.1976); *Mellick v. EEOC,* 410 F.Supp. 736 (W.D.Pa.1976); *Chmill v. City of Pittsburgh,* 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977); *cf. Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 85, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (Title VII does not require an employer to discriminate against some employees in order to enable others to observe their Sabbath); *Steele v. Louisville & Nashville R.R.,* 323 U.S. 192, 209, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (Constitution forbids discrimination against any race, creed or color).

Defendant relies on cases in which the courts have ordered affirmative relief to minorities, including the imposition of quotas, in order to redress the inequities caused by a pattern of past discrimination. *See, e. g., Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission,* 490 F.2d 387 (2d Cir. 1973); *Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973); *Carter v. Gallagher,* 452 F.2d 315, 330 (8th Cir.) (on rehearing en banc), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). However, the record in the instant case is devoid of any past racial discrimination with respect to promotions at the Naval Ammunition Depot at McAlester. While there was testimony that the percentage of blacks in the GS system was considerably lower than the percentage of blacks living in the recruiting area, that there was only

---

3. Plaintiff seeks those remedies in this action.

one black wage grade supervisor and that Kirk was the highest grade black employee in the GS system, this case does not involve, and neither side has contended that it does, the hiring practices at the depot, and there is no contention and no evidence that the promotion practices at the depot had been discriminatory against blacks or other minorities. The *Vulcan, Bridgeport* and *Carter* cases, upon which defendant relies, are not applicable here. They involved discriminatory practices in determining the qualifications of applicants for positions on fire and police departments, and the courts in those cases had before them effects of past discriminatory conduct in hiring which could be corrected by granting affirmative relief to minority applicants. Since there is no evidence or even contention in this case of any discriminatory conduct against minorities with respect to promotions at the depot, there is no basis for corrective action on the part of the court or the defendant. *See Weber v. Kaiser Aluminum & Chemical Corp.*, 563 F.2d 216, 224–26 (5th Cir. 1977).

The evidence adduced in this case shows that plaintiff was clearly better qualified for the GS–332–09 position than Kirk, and that he was the best qualified of the three applicants who appeared on the certificate of eligibles. In spite of the fact that Kirk and Jones received the identical combined score of 100 by the rating panel and irrespective of whether or not the tiebreaking procedure only applies to the rating panel, there is no question but that all the relevant information, which was brought to Captain Smith's attention and was available to him for his consideration, demonstrates plaintiff's superior qualifications. Smith completely disregarded such factors as the two awards received by plaintiff, *see Day v. Mathews*, 174 U.S.App.D.C. 231, 232, 530 F.2d 1083, 1084 (1976) (improper denial of rating points for certain awards), plaintiff's seven to eight years of supervisory experience in the computer department next preceding his application compared to none of Kirk's other than insignificant supervision during 4 years of military service from 1954 until 1958, *see Mellick v. EEOC*, 410 F.Supp. 736, 738 (W.D.Pa.1976) (person se-

lected had more supervisory and managerial experience than plaintiff), the supervisory appraisals by Williams and McRee, Kirk's unsatisfactory sick leave record, his informal reprimand for excessive tardiness and his problems with creditors. While acknowledging that the supervisor of an applicant would be in the best position to judge his qualifications, Captain Smith chose to completely ignore Mae McRee's evaluation of Kirk and Jones and did not even attempt to verify any of the objective criteria relative to Kirk's and plaintiff's qualifications or disqualifications which she brought to his attention. Moreover, Smith either did not bother to check the job description of the GS–332–09 position or if he did, he chose to ignore it, since it called for 80 percent supervisory and managerial duties and only 20 percent hands-on operation; yet the only concrete reason other than the 100 point scores Smith could give for his conclusion that Kirk and Jones were equally qualified was that Kirk had worked as a computer operator and that the GS–9 position was a working supervisor position on the same computer.

Furthermore, Smith had several meetings with Kirk and none with plaintiff; Kirk was called by Dunn on the last day application could be made and made aware of the opening; no one called plaintiff; Smith and Dunn were both apprehensive about Kirk, who was an EEO activist; and Smith did not follow the merit promotion plan when he divested the department head, Mae McRee, of her selection authority after Dunn had personally advised Smith of the opening and the applicants therefor.

■ While any of the circumstances set forth above standing alone may not be sufficient to establish that race instead of merit was the deciding factor in the selection made, the court concludes on the basis of the evidence and the demeanor and credibility of the witnesses that under all the facts and circumstances surrounding the promotion, *race was the deciding factor and that but for this discrimination plaintiff would have been promoted.* While Captain Smith denied that race was a factor the court is

convinced that the opposite is true. The following statement of the Tenth Circuit is applicable here:

> The trial court also found that as a result of the information imparted by the Bank concerning the filing of a sex discrimination charge, Rutherford lost her employment opportunity at the Citizens Bank. On appeal, counsel asserts that this finding is clearly erroneous. It is true the officials of the Citizens Bank testified that the reason they did not hire Rutherford was unrelated to the fact that Rutherford had filed charges against the Bank. However, this matter is not necessarily resolved by such self-serving statements. Inferences from circumstantial facts may frequently amount to "full proof" of a given theory, and may on occasion even be strong enough to overcome the effect of direct testimony to the contrary. *The Wenona,* [19 Wall. 41], 86 U.S. 41, 58, 22 L.Ed. 52 (1873).

*Rutherford v. American Bank of Commerce,* 565 F.2d 1162 at (10th Cir. 1977).

This is not a case where the better or equally qualified applicant was selected. *Compare Rogers v. EEOC,* 179 U.S.App. D.C. 270, 271, 551 F.2d 456, 457 (1977) (selectee was better qualified than plaintiff); *Mosley v. United States,* 425 F.Supp. 50, 58 (N.D.Cal.1977) (plaintiff was rated fifth of six applicants and ten points below the top rated applicant who was promoted); and *Mellick v. EEOC,* 410 F.Supp. 736, 738 (W.D.Pa.1976) (person selected had more supervisory and managerial experience than plaintiff), *with Abrams v. Johnson,* 534 F.2d 1226, 1231 (6th Cir. 1976) (plaintiff rated ten points superior to person selected); *Day v. Mathews,* 174 U.S.App.D.C. 231, 530 F.2d 1083 (1976) (plaintiff had been improperly denied rating points for certain awards); and *Cramer v. Virginia Commonwealth University,* 415 F.Supp. 673, 676 (E.D.Va. 1976) (plaintiff's academic credentials were equal to or exceeded those of the individual hired for at least one of the two positions). Plaintiff in this case was clearly the best qualified applicant for the position.

The court accordingly concludes that plaintiff has made out a prima facie case of racial discrimination. Defendant has not met its burden of showing a nondiscriminatory reason for the promotion, and has not proved by clear and convincing evidence that plaintiff would not have been promoted in any event, even absent discrimination. *Day v. Mathews,* 174 U.S.App.D.C. 231, 233, 530 F.2d 1083, 1085 (1976). "[G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

Since plaintiff has been the victim of defendant's racial discrimination with respect to the promotion of August 18, 1974, plaintiff is entitled to retroactive promotion to the GS–9 position as of August 18, 1974 with back pay accruing from that date. Judgment will be entered in conformity herewith.

Plaintiff is hereby granted five days to submit computations, affidavits and other relevant documents showing the amount he wishes to claim as a reasonable attorney's fee pursuant to 42 U.S.C. § 2000e–5(k). Defendant will have five days thereafter to respond.